Anna Y. Park, SBN 164242
Sue J. Noh, SBN 192134
Rumduol Vuong, SBN 264392
Nakkisa Akhavan, SBN 286260
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 East Temple Street, Fourth Floor
Los Angeles, CA 90012
Telephone:  (213) 894-1083
Facsimile:  (213) 894-1301
E-Mail:  lado.legal@eeoc.gov

Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> PRESTIGE CARE, INC., PRESTIGE SENIOR LIVING, LLC, CYPRESS POINT VENTURES, LLC,PRESTIGE SENIOR MANAGEMENT, LLC, CARE CENTER (ANCHORAGE), INC., GREEN VALLEY VENTURES, LLC, LAKE HAVASU TOO, LLC, SIERRA VISTA VENTURES, LLC, CHICO VENTURES, LLC, MANTECA VENTURES, LLC, MARYSVILLE VENTURES, LLC, OROVILLE ASSISTED LIVING, LLC, VISALIA VENTURES, LLC, CARE CENTER (LEWISTON), INC., CALDWELL VENTURES, LLC, PARKWOOD MEADOWS, LLC, KALISPELL VENTURES, LLC, HENDERSON VENTURES II, LLC, CARE CENTER (GLISAN), INC., CARE CENTER (HOOD RIVER), INC., CARE CENTER | Case No.: <br><br> **COMPLAINT—ADA** <br><br><br> **JURY TRIAL DEMAND** |

(LANECO), INC., CARE CENTER (LINDA )
VISTA), INC., CARE CENTER (MENLO )
PARK), INC., CARE CENTER )
(PORTHAVEN), INC., CARE CENTER )
(WILLOWBROOK), INC., PCI CARE )
VENTURE I, INC., SUMMERPLACE )
ASSISTED LIVING, LLC, CARE CENTER )
(CAMAS), INC., CARE CENTER )
(CENTRALIA), INC., CARE CENTER )
(COLVILLE), INC., CARE CENTER )
(EDMONDS), INC., CARE CENTER )
(HAZEL DELL), INC., CARE CENTER )
(SULLIVAN PARK), INC., CARE CENTER )
(SUNNYSIDE), INC., CARE CENTER )
(TOPPENISH), INC., GIG HARBOR )
VENTURES, LLC, LIVING COURT )
VENTURES, LLC, ENUMCLAW )
VENTURES II, LLC, AND DOES 1-100, )
INCLUSIVE, )
                                     )
                  Defendants.        )

## NATURE OF THE ACTION

This is an action under the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendment Act of 2008 ("ADAAA"), to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Charging Party Mitchell Miller and other individuals who were adversely affected by such practices.  As set forth with greater particularity in paragraphs 87 to 119 of this Complaint, Plaintiff United States Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") alleges that Defendant Prestige Care, Inc., Prestige Senior Living, LLC, Cypress Point Ventures, LLC, Prestige Senior Management, LLC,[1] Care Center (Anchorage), Inc., Green Valley Ventures, LLC, Lake Havasu Too, LLC, Sierra Vista Ventures, LLC, Chico Ventures, LLC, Manteca Ventures, LLC,

---

[1]Defendants Prestige Care, Inc., Prestige Senior Living, LLC, Cypress Point Ventures, LLC, Prestige Senior Management, LLC are hereinafter collectively referenced as "Management Defendants" and the remaining Defendants are collectively referenced hereinafter as "Facility Defendants."

Marysville Ventures, LLC, Oroville Assisted Living, LLC, Visalia Ventures, LLC, Care Center (Lewiston), Inc., Caldwell Ventures, LLC, Parkwood Meadows, LLC, Kalispell Ventures, LLC, Henderson Ventures II, LLC, Care Center (Glisan), Inc., Care Center (Hood River), Inc., Care Center (Laneco), Inc., Care Center (Linda Vista), Inc., Care Center (Menlo Park), Inc., Care Center (Porthaven), Inc., Care Center (Willowbrook), Inc., PCI Care Venture I, Inc., Summerplace Assisted Living, LLC, Care Center (Camas), Inc., Care Center (Centralia), Inc., Care Center (Colville), Inc., Care Center (Edmonds), Inc., Care Center (Hazel Dell), Inc., Care Center (Sullivan Park), Inc., Care Center (Sunnyside), Inc., Care Center (Toppenish), Inc., Gig Harbor Ventures, LLC, Living Court Ventures, LLC, Enumclaw Ventures II, LLC, and Does 1-100 (collectively, "Defendants") unlawfully discriminated against a class of individuals on the basis of disability by imposing a 100% healed/100% fit for duty qualification standard, denying light duty, failing to engage in the interactive process, failing to provide reasonable accommodations, terminating, and/or failing to hire individuals on the basis of their actual, record of, or perceived disability.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-5(f)(1) and (3) and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court of California, Eastern District.

## PARTIES

3.      Plaintiff EEOC is an agency of the United States of America, charged with the administration, interpretation and enforcement of Title I of the ADA, and is expressly authorized to bring this action by Section 107(a) of the ADA which incorporates by reference Section 705(f) (1) and (3), 42 U.S.C. §§ 2000e-5(f)(1) and (3).

4.     Each Defendant is a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2) and each Defendant is an employer engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C. § 12111(5)(A).

**MANAGEMENT DEFENDANTS**

5.     At all relevant times, Defendant Prestige Care, Inc. has been a corporation that owns and operates senior nursing facilities and assisted living facilities in the States of California, Oregon, Washington, Alaska, Idaho, Montana, Nevada, and Arizona.

6.     At all relevant times, Defendant Prestige Care, Inc. has been a corporation doing business in the State of California, in the following counties:  Butte County, San Joaquin County, Tulare County, and Yuba County.

7.     At all relevant times, Defendant Prestige Care, Inc. has continuously been a corporation doing business in the State of California, and has continuously had at least 15 employees.

8.     At all relevant times, Defendant Prestige Senior Living, LLC has been a limited liability company that owns and operates senior nursing facilities and assisted living facilities in the States of California, Oregon, Washington, Alaska, Idaho, Montana, Nevada, and Arizona.

9.     At all relevant times, Defendant Prestige Senior Living, LLC has been a limited liability company doing business in the State of California, in the following counties:  Butte County, San Joaquin County, Tulare County, and Yuba County.

10.     At all relevant times, Defendant Prestige Senior Living, LLC has continuously been a limited liability company doing business in the State of California, and has continuously had at least 15 employees.

11.     At all relevant times, Defendants Prestige Care, Inc. and Prestige Senior Living, LLC have been joint employers with each other named Defendant in that Prestige Care, Inc. and Prestige Senior Living, LLC imposed policies and procedures that violate the ADA at each other named Facility Defendants.  Defendants Prestige Care, Inc. and Prestige Senior Living, LLC also provided guidance and mandates as to how the commonly adopted policies and

procedures should be implemented as to individual employees who request leave or other reasonable accommodations.  Defendants Prestige Care, Inc. and Prestige Senior Living, LLC imposed a 100% heal/100% fit for duty/no light duty qualification standards at the named Facility Defendants that denied employment to persons who needed light duty, had medical/physical restrictions, requested leave or other reasonable accommodations, and implemented maximum leave and no light duty policies that ignored employers' obligation to engage in the interactive process and provide reasonable accommodations.

## **FACILITY DEFENDANTS**

12.   At all relevant times, Defendant Cypress Point Ventures, LLC has been a limited liability company that owns and operates pharmacies and provides pharmacy services to senior nursing facilities and assisted living facilities which are the other named defendants in this action.  Defendant Cypress Point Ventures, LLC imposed policies and procedures in violation of the ADA with Management Defendants.

13.   At all relevant times, Defendant Cypress Point Ventures, LLC has been a limited liability company doing business in San Joaquin County, in the State of California, and has continuously had at least 15 employees.

14.   At all relevant times, Defendant Prestige Senior Management, LLC has been a limited liability company doing business in Butte County, San Joaquin County, Tulare County, and Yuba County, in the State of California, and has continuously had at least 15 employees. Defendant Prestige Senior Management, LLC imposed policies and procedures in violation of the ADA with Management Defendants.

15.   At all relevant times, Defendant Care Center (Anchorage), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Alaska, and has continuously had at least 15 employees.

16.   At all relevant times, Defendant Care Center (Anchorage), Inc. has been subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Anchorage), Inc. as alleged in this action.

17.   At all relevant times, Defendant Green Valley Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Arizona, and has continuously had at least 15 employees.

18.   At all relevant times, Defendant Green Valley Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Green Valley Ventures, LLC as alleged in this action.

19.   At all relevant times, Defendant Lake Havasu Too, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Arizona, and has continuously had at least 15 employees.

20.   At all relevant times, Defendant Lake Havasu Too, LLC has been a subsidiary Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Lake Havasu Too, LLC as alleged in this action.

21.   At all relevant times, Defendant Sierra Vista Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Arizona, and has continuously had at least 15 employees.

22.   At all relevant times, Defendant Sierra Vista Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Sierra Vista Ventures, LLC as alleged in this action.

23.   At all relevant times, Defendant Chico Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in Butte County, California, and has continuously had at least 15 employees.

24.   At all relevant times, Defendant Chico Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Chico Ventures, LLC as alleged in this action.

25.   At all relevant times, Defendant Manteca Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in San Joaquin County, California, and has continuously had at least 15 employees.

26.   At all relevant times, Defendant Manteca Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Manteca Ventures, LLC as alleged in this action.

27.   At all relevant times, Defendant Marysville Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in Yuba County, California, and has continuously had at least 15 employees.

28.   At all relevant times, Defendant Marysville Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Marysville Ventures, LLC as alleged in this action.

29.   At all relevant times, Defendant Oroville Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in Butte County, California, and has continuously had at least 15 employees.

30.   At all relevant times, Defendant Oroville Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Oroville Ventures, LLC as alleged in this action.

31.   At all relevant times, Defendant Visalia Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in Tulare, County, California, and has continuously had at least 15 employees.

32.   At all relevant times, Defendant Visalia Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Visalia Ventures, LLC as alleged in this action.

33.   At all relevant times, Defendant Care Center (Lewiston), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Idaho, and has continuously had at least 15 employees.

34.   At all relevant times, Defendant Care Center (Lewiston), Inc. has been a wholly owned subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Lewiston), Inc. as alleged in this action.

35.   At all relevant times, Defendant Caldwell Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Idaho, and has continuously had at least 15 employees.

36.   At all relevant times, Defendant Caldwell Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Caldwell Ventures, LLC as alleged in this action.

37.   At all relevant times, Defendant Parkwood Meadows, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Idaho, and has continuously had at least 15 employees.

38.   At all relevant times, Defendant Parkwood Meadows, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Parkwood Meadows, LLC as alleged in this action.

39.   At all relevant times, Defendant Kalispell Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Montana, and has continuously had at least 15 employees.

40.   At all relevant times, Defendant Kalispell Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Kalispell Ventures, LLC as alleged in this action.

41.    At all relevant times, Defendant Henderson Ventures II, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Nevada, and has continuously had at least 15 employees.

42.    At all relevant times, Defendant Henderson Ventures II, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Henderson Ventures II, LLC as alleged in this action.

43.    At all relevant times, Defendant Care Center (Glisan), Inc. has been a senior nursing facility incorporated and located in the State of Oregon and has continuously had at least 15 employees.

44.    At all relevant times, Defendant Care Center (Glisan), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Glisan), Inc. as alleged in this action.

45.    At all relevant times, Defendant Care Center (Hood River), Inc. has been a senior nursing facility incorporated and located in the State of Oregon and has continuously had at least 15 employees.

46.    At all relevant times, Defendant Care Center (Hood River), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Hood River), Inc. as alleged in this action.

47.    At all relevant times, Defendant Care Center (Laneco), Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

48.    At all relevant times, Defendant Care Center (Laneco), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Laneco), Inc. as alleged in this action.

49.     At all relevant times, Defendant Care Center (Linda Vista), Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

50.     At all relevant times, Defendant Care Center (Linda Vista), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Linda Vista), Inc. as alleged in this action.

51.     At all relevant times, Defendant Care Center (Menlo Park), Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

52.     At all relevant times, Defendant Care Center (Menlo Park), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Menlo Park), Inc. as alleged in this action.

53.     At all relevant times, Defendant Care Center (Porthaven), Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

54.     At all relevant times, Defendant Care Center (Porthaven), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Porthaven), Inc. as alleged in this action.

55.     At all relevant times, Defendant Care Center (Willowbrook), Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

56.     At all relevant times, Defendant Care Center (Willowbrook), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Willowbrook), Inc. as alleged in this action.

57.   At all relevant times, Defendant PCI Care Venture I, Inc. has been a senior nursing facility incorporated and located in the State of Oregon, and has continuously had at least 15 employees.

58.   At all relevant times, Defendant PCI Care Venture I, Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant PCI Care Venture I, Inc. as alleged in this action.

59.   At all relevant times, Defendant Summerplace Assisted Living, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Oregon, and has continuously had at least 15 employees.

60.   At all relevant times, Defendant Summerplace Assisted Living, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Summerplace Assisted Living, LLCas alleged in this action.

61.   At all relevant times, Defendant Care Center (Camas), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

62.   At all relevant times, Defendant Care Center (Camas), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Camas), Inc. as alleged in this action.

63.   At all relevant times, Defendant Care Center (Centralia), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

64.   At all relevant times, Defendant Care Center (Centralia), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Centralia), Inc. as alleged in this action.

65.    At all relevant times, Defendant Care Center (Colville), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

66.    At all relevant times, Defendant Care Center (Colville), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Colville), Inc. as alleged in this action.

67.    At all relevant times, Defendant Care Center (Edmonds), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

68.    At all relevant times, Defendant Care Center (Edmonds), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Edmonds), Inc. as alleged in this action.

69.    At all relevant times, Defendant Care Center (Hazel Dell), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

70.    At all relevant times, Defendant Care Center (Hazel Dell), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Hazel Dell), Inc. as alleged in this action.

71.    At all relevant times, Defendant Care Center (Sullivan Park), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

72.    At all relevant times, Defendant Care Center (Sullivan Park), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Sullivan Park), Inc. as alleged in this action.

73.   At all relevant times, Defendant Care Center (Sunnyside), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

74.   At all relevant times, Defendant Care Center (Sunnyside), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Sunnyside), Inc. as alleged in this action.

75.   At all relevant times, Defendant Care Center (Toppenish), Inc. has been a senior nursing facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

76.   At all relevant times, Defendant Care Center (Toppenish), Inc. has been a subsidiary of Defendant Prestige Care, Inc., and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Care Center (Toppenish), Inc. as alleged in this action.

77.   At all relevant times, Defendant Gig Harbor Ventures, LLC has been an assisted living facility incorporated in the State of Oregon, located in the State of Washington, and has continuously had at least 15 employees.

78.   At all relevant times, Defendant Gig Harbor Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Gig Harbor Ventures, LLC as alleged in this action.

79.   At all relevant times, Defendant Living Court Ventures, LLC, a limited liability company formed in the State of Oregon, has been an assisted living facility located in the State of Washington and has continuously had at least 15 employees.

80.   At all relevant times, Defendant Living Court Ventures, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Living Court Ventures, LLC as alleged in this action.

-13-

81.   At all relevant times, Defendant Enumclaw Ventures II, LLC, a limited liability company formed in the State of Washington, has been an Alzheimer's and dementia care facility located in the State of Washington, and has continuously had at least 15 employees.

82.   At all relevant times, Defendant Enumclaw Ventures II, LLC has been a subsidiary of Defendant Prestige Senior Living, LLC, and Management Defendants collectively and jointly ratified, participated in, and/or imposed the ADA violations attributable to and/or occurring at Defendant Enumclaw Ventures II, LLC as alleged in this action.

83.   Defendants' filings with the Oregon Secretary of State and Washington Secretary of State in 2016 reflect that all Defendants share the same officers, directors, and ownership.

84.   Management Defendants exercised ultimate control over each Facility Defendant's personnel matters as set forth in the contact between each Facility and Management Defendants.  Employees of the Management Defendants oversaw day-to-day operations of the Facility Defendants, including but not limited to recruiting, hiring, disciplining, firing, and supervising the Facility Defendants' employees and issuing all personnel policies, issuing pay checks of the Facility Defendants' employees, and maintaining the human resource functions for the Facility Defendants.  Management Defendants' personnel had the authority to fire, hire, and transfer employees of the Facility Defendants.  The same personnel policies and practices apply to all Defendants.  The ultimate decision making power on all terms and conditions of employment rested with Management Defendants' officials, including but not limited to the denial of reasonable accommodation and the failure to engage in the interactive process.  Management Defendants mandated and enforced the written restrictive light duty and maximum leave policies at each Facility Defendant.  In addition to personnel matters, Management Defendants controlled various other aspects of each Facility's operations as also set for in the contact.

85.   Facility Defendants routinely sought the approval of Management Defendants' Benefits Manager Mitchell Court and Sinikka Loukola of Management Defendants' Human Resources for final decisions and/or guidance pertaining to request for accommodation without properly engaging in the interactive process.  Management Defendants' official including, but

not limited to Court and Loukola routinely approved and/or ratified Facility Defendants' on-site managers' decisions that violated the ADA such as denying leave as an accommodation, denying light duty, implementing the qualification standards of requiring employees to be 100% healed and 100% fit for duty, denying other reasonable accommodations, and failing to hire applicants on the basis of disability and/or applicants perceived to be disabled.

86.   Management Defendants issued paychecks to each employee of a Facility Defendant as well as employee handbooks and policies.

87.   All acts and failures to act allegedly committed by Facility Defendants herein were duly performed by and attributable to the Management Defendants, acting as a successor, agent, alter ego, indirect employer, joint employer, integrated enterprise and/or or under the direction and control of the others, except as specifically alleged otherwise.  Facility Defendants' acts and failures to act were within the scope of such agency and/or employment, and Management Defendants participated in, approved and/or ratified the unlawful acts and omissions by the Facility Defendants complained of herein.  Whenever and wherever reference is made in this Complaint to any act by a Facility Defendant, such allegations and reference shall also be deemed to mean the acts and failures to act of Management Defendants acting individually, jointly, and/or severally.

88.   Plaintiff is ignorant of the true names and capacities of each Defendant sued as DOES 1 through 100, inclusively, and therefore Plaintiff sues said defendant(s) by fictitious names.  Plaintiff reserves the right to amend the complaint to name each DOE defendant individually or collectively as they become known.  Plaintiff alleges that each DOE defendant was in some manner responsible for the acts and omissions alleged herein and Plaintiff will amend the complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

## STATEMENT OF CLAIMS

89.   More than thirty days prior to the institution of this lawsuit, Charging Party Mitchell Miller ("Charging Party" or "Miller") filed a charge of discrimination with Plaintiff alleging violations of ADA by Defendants.

90.    Prior to instituting this lawsuit, the EEOC attempted to eliminate the unlawful employment practices alleged herein and to effect voluntary compliance with the ADA through informal methods of conciliation, conference, and persuasion.

91.    All conditions precedent to the institution of this lawsuit have been fulfilled.

92.    Since 2012 and before, Defendants maintained an inflexible 100% healed/100% fit for duty policy which does not provide for reasonable accommodation of qualified individuals with disabilities in violations of Section 102 (a), (b)(5) and b(6) of the ADA, 42 U.S.C. § 12112 (a), (b)(5), and (b)(6).

93.    Defendants violated the ADA by failing to engage in the interactive process and provide reasonable accommodations and instead discharged employees who had known disabilities, requested light duty, were suspected of not being able to perform 100% of job duties including marginal functions and other jobs, and/or exhausted leave under the Family and Medical Leave Act of 1993 ("FMLA") and/or personal time off.

94.    Defendants imposed policies and procedures in which employees were required to operate at 100% of all of their job duties including those that were not essential functions of the job and to perform duties outside of their job duties, denied leave to individuals who needed to obtain medical attention, and forced employees to resign because they could not operate at 100% without an accommodation.  Through the implementation of the 100% healed/100% fit for duty/no light duty policies, Defendants violated the ADA by imposing qualification standards that were not job-related or consistent with business necessity and otherwise failing to abide by the ADA. Each Management Defendant and Facility Defendant implemented the aforementioned 100% healed/100% fit for duty/no light duty policies resulting in the violation of the ADA.

95.    Management Defendants issued at each Facility Defendant a written policy which states that, "Employees returning from a leave that was not due to a work-related injury (W C) must be able to perform 100% of job duties. Prestige does not provide light duty except in the case of an on the job injury."  Defendants enforced this policy at all facilities and applied this policy in a manner that required employees to be able to fully perform not only essential

functions of their job, but marginal functions, and even jobs of other employees.

96.     To enforce this policy, Defendants systematically discharged individuals who sought light duty or had injuries regardless of whether they were qualified individuals with disabilities who could perform the essential functions of the job with or without a reasonable accommodation.

97.     Management Defendants also issued at each Facility Defendant a written leave of absence policy which states that, "During your leave your job is only protected if your leave qualifies under State or Federal law. If your leave does not qualify you may apply for open positions when you return from your leave. If you do not return from the authorized leave of absence at the agreed time, if there is no open position for which you qualify to fill, or if you are not selected for the open position your employment will be terminated." To enforce this policy, Defendants denied employees light duty and systematically terminated individuals who sought leave, sought to exceed Defendants' arbitrary maximum leave allotment, and/or attempted to return to work after a medical leave of absence, regardless of whether they were qualified individuals with disabilities who could perform the essential functions of the job with or without reasonable accommodation.  Employees were also discouraged and deterred from attending routine medical appointments related to their disabilities.

**Count 1:  100% Healed and 100% Fit for Duty as**

**Qualification Standard to Deny Return to Work**

98.     Plaintiff incorporates by reference the above facts regarding Defendants' 100% healed/no light duty policies that in tandem only allowed those who were 100% fit for duty and did not need an accommodation to work.  In other words, Defendants implemented a qualification standard that violated the ADA that only allowed employees to work if they were "100%" able to perform all job functions including marginal job functions without accommodation to work as shown by the sampling of individuals described below:

99.     Stephanie Chilton began working at Orville Assisted Living, LLC as the Lead Cook from August 28, 2007 to August 28, 2013.  On August 27, 2013, Chilton injured her knee and was diagnosed on August 28, 2013, with persistent right patellar dislocation that

resulted in the ligaments and tendons around her kneecap being torn or stretched.  The doctor

initially estimated that the injury required four to six weeks to heal.  On or about August 29,

2013, Chilton submitted a doctor's note stating that she could not return to work until

September 13, 2013.  Chilton submitted a request for leave on August 30, 2013.  Chilton also

attempted to inform Defendants that she would need accommodations for her injured knee

upon returning to work as she continued to heal.  Lori Kelley, the Acting Executive Director of

the facility, informed her that she had exhausted her CFRA/FMLA leave, and as such,

Defendants were under no obligation to accommodate her restrictions.  Kelley then told

Chilton that she was terminated because the restrictions due to her knee injury could not be

accommodated.  Nonetheless, Chilton later submitted another doctor's note dated October 1,

2013, stating that she could not return to work until February 1, 2014.

      100.   Rachel J. David, Health Services Director for Orville Assisted Living, LLC

emailed the October 1, 2013, doctor's note for Chilton to Mitchell Court, Benefits Manager,

Prestige Care, Inc.  Court responded that Chilton had used all twelve weeks of FLMA leave

and that by allowing Chilton to remain an active employee between August and October 2013,

Chilton had essentially been given a personal leave.  Court further stated that "Personal Leave

is for a maximum of 45 days, if she can't return within that 45 days it will become necessary to

terminate and allow her to apply for an open position at the time that she is released.  Also,

while on Personal Leave there is not guarantee of employment, you can fill her position and

terminate her at any time."  Thus, while Chilton's last day worked was August 27, 2013,

Defendants officially terminated her on October 2, 2013, at the direction of Prestige Care,

Inc.'s Benefits Manager.  Chilton had exhausted FMLA due to a back injury, hernia, neck

injury, and shoulder injury after she fell at Defendants' Oroville facility on March 12, 2012.

On October 14, 2013, Rachel David told Chilton that since she had exhausted FMLA leave,

she had 45 days of personal leave to the extent that it was not exhausted.  Because she did not

have any personal leave available, David who was acting as Interim Executive Director denied

any additional leave as an accommodation.  As the worker's compensation claim for the neck,

shoulder, and back injuries, and hernia was being processed, Chilton suffered the August 27,

2013, knee injury which Defendants summarily refused to accommodate because she had exhausted FMLA and personal leave due to the other injuries.  By letter dated July 1, 2015, Liberty Mutual Insurance issued a "Notice Regarding Permanent Disability Benefits DWC 500-B" for the back injury and hernia with payments for a permanent disability starting from December 29, 2014, as she was deemed unable to work as of December 29, 2014, under the California worker's compensation laws.  Here, Defendants never engaged in an interactive process when Chilton sought leave or light duty in August 2013 related to her knee injury. Defendants imposed a de facto maximum leave limited to that available under the FMLA and personal leave without engaging in the interactive process to identify a reasonable accommodation such as a short extension of leave or light duty.

101.  Amanda Morales worked at Manteca Ventures, LLC as a Personal Care Attendant.  On August 16, 2012, Morales suffered an injury while assisting a very heavy resident who could not be lifted by one person.  Morales was helping another assistant who was not very experienced.  Morales was lifting the resident under her arm, and attempting to pivot the resident into his wheelchair.  Morales and the assistant she was helping almost dropped the resident.  But, Morales tried to let the resident slide down her own body to avoid injury to the resident.  In doing so, Morales tripped on the wheelchair, fell backwards into the wheelchair, and the resident fell on top of Morales. This resulted in Morales sustaining nerve damage.  Morales was pregnant at the time of the accident, and later lost her baby.

102.  Immediately after the accident, Morales went to see Prestige's Worker's Compensation doctor, "Dr. Gloria."  Dr. Gloria imposed a light duty requirement for Morales, with a five-pound lifting restriction.  Upon returning to work just a few days after the accident, she asked the management to work in the "front end" of the facility, where there was no lifting requirement.  Morales informed the management and her supervisors, specifically the Med Tech that put her on kitchen duty, that she was on light duty as prescribed by Dr. Gloria, and that she could not bend down and would not be able to lift five pounds or more.  She also submitted Dr. Gloria's note with the lifting restriction.  But, the management staff merely brushed off her request and responded that she "looked fine," and that since she was "still here,

[she] needs to perform her job." The management staff, Taylor Mead (the Back Floor director/supervisor), and Bertha Rodriguez (the Business Office Manager), as well as the Med Techs who acted as the liaison for the Personal Care Attendants and management, told Morales that the kind of profession that she was engaged in was "not for light duty," and that "this is what [she] signed on for." Additionally, they said Defendants would not give light duty to Morales because there was a policy of no light duty.  Morales was put to work in the kitchen serving breakfast, which required her to lift breakfast pans to serve the residents.  At this point in time, Morales was suffering from the effects of the accident, and was experiencing numbness in her arms, trouble breathing, experiencing pain while bending down, and unable to lift objects, and informed her supervisors of her physical limitations.  She also informed them that she was unlikely to be able to lift a pan of bacon, and that she would be unable to bend down due to her injury.  However, the Med Tech who was supervising her simply looked at her, and told her, "figure it out."  Management and supervising staff continued to assign her hours and ask her to physically assist with residents in violation of the lifting restriction.

103.  Then on August 18, 2012, Morales was instructed to carry a pan of bacon for the residents' breakfast.  However, due to her injury, she was unable to lift the pan, and ended up dropping the pan of bacon on the kitchen floor.  She went to the emergency room immediately thereafter. The emergency room doctor gave Morales a note instructing her to take leave from work for about two weeks to heal from her injury.  The day her leave was to expire, Morales was still experiencing pain from the injury and felt she would be unable to return to work at that point, as her ribs were still hurting, having problems breathing, and had pain when she bent down.  She saw a doctor again, who was unable to perform an x-ray on her because she was pregnant at the time.  Being unable to run more comprehensive tests due to her pregnancy, her doctor prescribed another period of leave to assist in Morales' recovery.

104.  The day her first period of leave was to expire, Morales' fiancé faxed in the second doctor's note for the second period of leave.  However, following this, Business Office Manager Bertha Rodriguez called her and informed her she was scheduled to go back to work, and was confused as to why she sent in a second doctor's note requesting leave because they

had already written her into the work schedule.  When Morales informed them that she was on leave, Bertha Rodriguez, who discharged her on the phone, informed her that she would be terminated because she was scheduled to work that day, and she had missed that day's work. When Morales informed Rodriquez that she was on leave and had a doctor's note for the leave, Rodriquez replied that she would call her back, but never did.   Shortly thereafter, by letter dated September 10, 2012, Executive Director Linda Nickolisen terminated Morales for being a no call, no show for her August 12, 2012 shift despite that on August 18, 2012, Morales was as work and dropped the heavy bacon tray that put her in the emergency room that day.  The letter dated September 10, 2012 from Nickolisen ignores the fact that Morales was injured on August 16, 2012, when the patient fell on top of her and had been on leave since August 18, 2012.

105.    Cece Chang worked at Defendants' Care Center (Linda Vista, Inc.) since 1998 was a full-time Dietary Aide when she was 58 years old.  Chang was fired when she was 73 years old because she could not lift over 25 pounds in the laundry department where she worked at the time of her discharge.  Chang requested light duty as an accommodation for her disability, but Defendants denied light duty because they claimed they had no open positions and refused to evaluate the 25 pound lifting restriction, insisting she had to be able to lift 50 pounds.  On January 18, 2013, Chang reported suffering from back pain and on February 8, 2013, Chang submitted a doctor's note for leave with an estimated return to work date of February 18, 2013.  On February 14, 2013, Chang obtained further leave from February 18, through March 4, 2013.  On February 28, 2013, Chang obtained paid time off from March 4 through March 25, 2013, leaving her with no more leave.  On May 30, 2013, Chang submitted a form from her doctor stating she could return to work with a 10-pound lifting restriction. Defendants failed to engage in the interactive process to identify any available light duty for Chang that would allow her to work with a 10-pound lifting restriction.  Then on August 8, 2013, Chang submitted a further doctor's note stating she was able to return to work with a 25-pound lifting restriction.  On August 12, 2013, Chang was terminated because should could not lift up to 50 pounds and Defendants failed to provide her alternatives to lifting 50-pounds.

106.  Catherine Olver worked at Living Care Ventures, LLC as a part-time Personal Care Attendant from January 3, 2014 to July 5, 2014.  Soon after requesting an accommodation for a back injury sustained prior to her employment at this facility and a separate accommodation to undergo a non-invasive procedure, her hours were reduced and she was let go for allegedly not meeting credentials.  But during the seven months she worked for Defendants, they denied Olver's repeated requests for safety equipment to transfer patients safely causing more pain to her back.  On one occasion when she asked a co-worker for help lifting a patient, she was told that the co-worker was not allowed to help her.  On another occasion, Olver approached her supervisor to discuss a potential shift change to allow her to undergo a non-invasive procedure. Olver's supervisor denied her request  to take leave to have the procedure done without giving any reason.  Olver was no longer included in the schedule soon after she requested the foregoing reasonable accommodations.

107.  Another example of Defendants implementing an improper qualification standard in violation of the ADA is the story of Generic Cowee.  After 6 years of employment, Cowee lost her job as the Lead Housekeeper because Defendants failed to provide leave as an accommodation.  Genic Cowee started working at Marysville Ventures, LLC also known as Prestige Assisted Living at Marysville in May 2007.  On or about June 28, 2013, Cowee began experiencing pain in her shoulder.  On October 21, 2013, Cowee started FMLA leave which expired on January 14, 2014.  Cowee needed 7.5 more months of leave but was terminated two months after her FMLA leave expired.  Specifically, Cowee was diagnosed with Right Shoulder Adhesive Capulitis, and on January 4, 2014, submitted a doctor's note stating she would need to be on medical leave for four months.  By letter dated January 30, 2014, Executive Director Aleta Walker asked Cowee to submit a "Reasonable Accommodation Request Form" within seven days of the date of the letter.  On or about February 19, 2014, Cowee submitted the required forms.  By letter dated February 27, 2014, Executive Director Walker informed Cowee that leave could not be extended to May 2014 and that she would be terminated effective March 14, 2014.  Accordingly, Defendants granted two months of leave after Cowee's FMLA leave expired but refused to grant an additional 45 days of medical leave

that would have taken her to May 2014 as recommended by her doctor.  Ultimately, Cowee was clear to return to work in August 2014 without restrictions.

108.  On June 6, 2012, Linda Gagliardi applied for a Registered Nurse (RN)-Supervisor position at Care Center Porthaven, Inc. also known as Porthaven Health Care Center. Gagliardi was hired on or about July 10, 2012.  In a background check form her job title is listed as Charge Nurse Supervisor while the Personal Action Notice listed her job title as RN. In early 2013, Gagliardi began experiencing pain in her right foot.  The constant pushing and pulling of heavy objects during her nursing shifts exacerbated the pain in her right foot. Gagliardi had previously experienced similar pain in her left foot, and she had been diagnosed with plantar fasciitis.  Her prior employer granted leave to have surgery on her left foot, and she returned to work after her surgery with no limitations and no lingering pain in her left foot.

109.  When Gagliari was scheduled for surgery on December 4, 2013, to correct the plantar fasciitis in her right foot, she first informed her supervisor, the Director of Nursing Services Darlene Geharsh, that she needed 4 weeks off for both the surgery and for recuperation.   Geharsh told Gagliardi that she would need to talk to Human Resources. Accordingly, Gagliardi informed Dawna Phillips, the Director of Human Resources.  But Phillips told her that a leave of that length would not be approved as personal leave and that instead Gagliardi would need to fill out FMLA paperwork.  There was no discussion regarding an interactive process or reasonable accommodation under the ADA.  However, Benefits Manager Mitchell Court had repeatedly informed other Executive Directors that Defendants could offer a 45-day personal leave.  Instead of immediately making the FMLA paperwork available to Gagliardi, Phillips said that she would print the FMLA paperwork later.  Gagliardi followed up with Phillips regularly to get the FMLA paperwork– at least once every two weeks depending on Phillips' availability.  In addition to checking in with Phillips, she followed up about the paperwork with Connie Ortega and her own supervisor, Darlene Geharsh.  Her last conversation about taking leave was with Connie Ortega the week of November 25, 2013.  She reminded Connie she would need to take leave for surgery and had not received the FMLA paperwork yet.  Ortega responded by acknowledging she was aware that Gagliardi had been

requesting leave.

110.   While Human Resources Director Phillips failed to give Gagliardi the FMLA forms, her surgery was moved up a week, requiring her to call in sick to work on December 1, 2013.  When Gagliardi called in on December 1, she told the nurse on the phone that she would be going into surgery, would be on a leave for recuperation, and further, informed the nurse that she would keep in touch regarding her recovery.   Phillips confirms that Gagliardi did call on December 1, but still did not provide her with the FMLA paperwork.  Sometime thereafter, on or before January 1, 2014, Phillips called Gagliardi and informed her that she would be terminated for failing to report to work.  Phillips claimed that she had the FMLA paperwork ready for Gagliardi on December 1, the day that Gagliardi called in sick because the surgery was moved up one week from the originally scheduled date of December 4, 2013.  Despite admitting that she did not have the FMLA paper work ready for Gagliardi until December 1, 2013, Phillips told Gagliardi that she intended to fire her as a "no call, no show."  Phillips forced Gagliardi to ask that her termination be changed to a voluntary resignation because Phillips insisted Gagliardi would be terminated.  This forced resignation became effective on January 1, 2014.  Gagliardi made a full recovery and had no pain in her right foot, and was hired in February 2014 as a Floor Nurse at another unaffiliated care center where she worked until her retirement in November 2016.  If Gagliardi had been granted the 45-day personal leave available pursuant to Benefits Manager Mitchell Court's instructions to Executive Directors of other facilities, Gagliardi could have submitted the FMLA forms after her surgery while she recovered.  But Defendants summarily terminated her despite their repeated failure to provide the FMLA forms.  Defendants should have granted some form of leave as an accommodation since all Gagliardi needed was about 60 days from when she called in sick on December 1, 2013, the day she went into surgery, to February 2014 when she started working for another employer.

111.   Claimant X[2] began working as a Dining Room Server / Dietary Aide at

---

[2] Claimant X's real name is withheld to protect his privacy.

Henderson Ventures II, LLC also known as Prestige Senior Living at Mira Loma on August 13, 2012. Claimant X has been HIV positive since 2007. For the first several months after he started working at the Mira Loma facility, Claimant X was unable to attend his periodic medical appointments due to his work schedule. When Claimant X asked his supervisor, Pete Hereld, to swap his day shift for an evening shift once every three months, Hereld denied the request. Thus, Claimant X continued to work his regular schedule, and was forced to miss several more medical appointments. Then in or around March 2013, after roughly eight months of missed medical appointments, Claimant X was forced to resign. Executive Director Barbara Gottlieb reported Claimant X's resignation to Sinikka Loukola at Prestige Care, Inc. and further relayed that Claimant X said he would be going to the "labor board." Gottlieb's reference to the "labor board" suggests Gottlieb's belief that Claimant X believed Defendants violated the law. But, Loukola as a representative of Management Defendants did not advise Gottlieb to change course or to attempt to engage in an interactive process to identify a reasonable accommodation. Instead, Management Defendants through Loukola tacitly ratified the failure to engage in the interactive process and reinforced the policy of denying any leave even for medical appointment. One month after his forced resignation, Claimant X collapsed and spent a month in the hospital. Defendants 100% healed policy denied this former employee the few days off he needed for routine medical treatment. Defendants applied their 100% healed/100% fit for duty/no light duty policies in a way that forced out worker who had medical conditions even if they only need to attend periodic prescheduled medical appointments.

112. Anthony Morelli worked at Defendants' Prestige Senior Living Bridgewood located in Vancouver, Washington, as a Cook from April 17, 2014 through July 8, 2014.[3] Defendants denied Morelli two days of medical leave needed every four to six months and

---

[3] Defendants issued Mr. Morelli a 2014 W-2 with "Prestige Senior Management, LLC" listed as the employer. However, his pay stubs were issued by Prestige Senior Management, Prestige Care, Inc. and Prestige Senior, L.L.C. in that all three of these Management Defendants appear on Mr. Morelli's paystubs.

forced him to resign.  Morelli suffers from permanent nerve damage resulting from a decades old injury sustained when he was seventeen.  Morelli suffers from constant leg and back spasms that make it hard for him to sit or stand in one position for more than ten to fifteen minutes at a time.  Morelli receives Radiofrequency Ablation (RFA) treatment which like a cortisone shot, eases some of the pain and spasms.   Morelli receives an RFA injection every four to six months.  After the RFA injection, the treatment also requires two consecutive days of bed-rest to be effective.

113.  At the time of his interview, Morelli disclosed his medical impairment to his supervisor Joe Morgan, stating that he would need to take two consecutive days off every few months to receive RFA injections, and that he would not be able to lift heavy objects due to his nerve damage.  Morelli was assured that he would not have to lift heavy objects. When several employees resigned from their positions, Defendants relied on Morelli to switch from a Part-Time Cook to a Full-Time Cook.  When Morelli requested two consecutive days off around May 2014 for his RFA injections, Defendants denied the leave request, stating that unless he could find someone to cover his shift to take the two days off, or he would not be granted leave.  Morelli could not find someone to cover his shift, so he canceled his RFA appointment for May 2014.  Additionally, even though Morelli was told he would not have to lift heavy objects, he would often find himself alone in the kitchen forced to lift heavy boxes.  The denial of leave and being forced to lift heavy boxes without help aggravated his nerve damage.

114.  Finally, after tolerating two more months of pain and spasms without treatment, Morelli scheduled another appointment for his RFA injection around July 2014.  Again, when Morelli requested two consecutive days off, he was denied. He was once again told that he could only take those days off if he found a replacement, and if he took the days off without finding a replacement, he should not return to work.  Morelli resigned because he could not skip another treatment.  Morelli's termination was effective July 8, 2014.

115.  Cathleen L. Hackett was hired on December 1, 1995 at Care Center Toppenish, Inc. but was forced to resign by letter dated June 8, 2012, from her position as Resident Care Manager because Defendants failed to provide her with previously approved accommodations

related to her the rotator cuff injury and shoulder fracture which occurred while she worked at Care Center Topennish, Inc.  On or about January 22, 2007, Hackett sustained a torn rotator cuff and fractured shoulder after a fall while working at Care Center Topennish, Inc.  On April 23, 2007, Hackett sought leave under FMLA from April 30, 2007 through May 31, 2007.  During this period, Hackett received shoulder surgery and returned to work on May 21, 2007, at which time she received an ergonomic work station and physical therapist at her job.  On September 6, 2008, the Washington State Department of Labor and Industries, Claim Section issued a form entitled "Activity Prescription Form" which stated that Hackett suffered from a Permanent restriction that required modified duty from September 5, 2008 through October 26, 2008.  Hackett continued to use the ergonomic work station from 2008 through late 2011 due to the permanent physical restrictions to her shoulder.  Defendants' failure to accommodate Hackett occurred in 2012 when her ergonomic work station was taken away for the last four months of her employment as described below.

116.  On or about November 28, 2011, Hackett suffered an ankle injury and requested FMLA leave from November 29, 2011 through February 2, 2012.   When she returned to work, in or around February 2012, Hackett's office had been relocated to in a smaller space that did not allow for her modified/ergonomic desk to fit and her work station had been taken away.  While Hackett kept asking the temporary administrator about the return of her accommodations, nothing was done.  The denial of the previously approved ergonomic work station exacerbated her shoulder pain.  Because Defendants failed to provide the previously approved accommodation from February 2012 through June 2012, Defendants forced her to resign on June 23, 2012, as the denial of the accommodation caused her shoulder to worsen.

## Count 2:  Failure to Accommodate in violation of the ADA

117.  Plaintiff incorporates by reference the above facts.

118.  On January 27, 2012, Mateca Ventures, LLC, also known as Prestige Senior Living at Manteca, hired Tonia Habenicht to work as a bus driver.  On January 11, 2012, she applied for the position through careerbuilder.com believing it was a part-time bus driver position.  Habenicht has held a Class A license with a passenger endorsement and school bus

driver's certificate and her careerbuilder application only listed driving experience because she only sought employment as a driver.  Habenicht has severe scoliosis, which prevents her from staying in the same position for more than fifteen to thirty minutes and she cannot twist or bend.  She responded to the careerbuilder posting because she believed that she would not have to sit for more than 20 minutes at a time as a shuttle bus driver.  On January 13, 2012, when J.B. Brewer interviewed her for the position, he informed her that it was a full-time position and when she was not driving, she might be asked to do a little "light" housekeeping consisting of a little dusting or vacuuming which are duties outside of the job she was hired to do.  Habenicht responded that she did not wish to be a housekeeper.  On the evening of January 27, 2012, after she had to fill out new hire paperwork, she called Brewer again because Business Office Manager Bertha Rodriguez mentioned that the past bus driver had worked in housekeeping.  Because Brewer reassured her during the evening call that it was only "light" housekeeping between trips, Habenicht accepted the job.

119.  For the first two weeks, she was only responsible for driving.  But after two weeks, Defendants required Habenicht to perform a second job as a housekeeper.  On or about February 21, 2012 Habenichet was forced to do housekeeping work full time to take on the tasks of full time hosuekeepers that happened to be absent. She had to absorb the job of other absent housekeeprs while still doing her own job of driving.  As a result, the extra duties exacerbated her scoliosis and caused great pain.  Executive Director Linda Nickolisen heard that Habenicht was unhappy and called her into the office the morning of February 22, 2012.  Habenicht explained that did not wish to be a housekeeper.  Nickolisen insisted that she needed to do full housekeeping when not driving the shuttle.   Habenicht responded that she had not been told she had to do full housekeeping when she was hired.  Nickolisen responded, "Well, that's the job."  When Habenicht offered to do the originally advertised job she was hired to do (driving the shuttle) and clock out whenever she not driving, Nickolisen said no.  Later that day Habenicht was called into Brewer's office with Bertha Rodriguez also present.  Rodriguez rudely stated that four hours was vacuuming was "light."  While Bertha Rodriguez admitted that Habenicht was hired for the bus driver position she still demanded four hours of

housekeeping in addition to the driving.  Similarly, all documents Defendant submitted to the EEOC regarding Habenicht confirm she was hired solely as a bus driver.  Because Defendants required her to perform several hours of housekeeping which were not listed in bus driver job description and cause her a great deal of pain, on February 23, 2012, she gave her two-week notice to Brewer.  After a week, the facility manager told her not to come in for her final week.  Defendants did, however, pay her for both weeks of her notice.  Because Defendants forced her to quit, due to the pain caused by the housekeeping duties, Habenicht submitted a letter detailing the above to Nikolisen with a copy to "Prestige Corporate Headquarters" in Vancouver, Washington.Kelly Effinger was hired on May 13, 2013, as a personal care attendant at Visalia Ventures, LLC also known as Prestige Care Visalia Assisted Living and Prestige Assisted Living at Visalia.  Effinger was terminated on July 12, 2013, because she spoke too loudly to a patient and this conversation was characterized by the company as "arguing."  Effinger was diagnosed with Tinnitus when she was a child and as a result she speaks loudly.  Tinnitus makes her hear tones and the hearing problem is exacerbated by allergies.  Tinnitus can result from age-related hearing loss, ear injury, or a circulatory system disorder.  Effinger was fired for her "tone" with a resident.  Specifically, on her final day of work, Effinger was talking to a resident at the end of the dining hall.  Effinger was washing dishes while trying to convince this resident that it was time for her to take a shower.  Later that day, Effinger's supervisor Melinda told her she needed to go home.  Effinger asked Melinda why she was being sent home and Melinda told her she didn't want her to say something wrong, so Effinger just needed to go home without being given any reason for being sent home.  Effinger asked Melinda again and Melinda told her that they would to talk the next day so Effinger then left.  Three days later, Effinger called the Executive Director and found out the reason why sent home, because of her tone with the resident. When she tried to explain her side of the story, the Executive Director would not listen and the termination became final.  Thus, the Executive Director failed to engage in the interactive process in that she refused to listen to the reason for Effinger's loud tone cause by Tinnitus.  Instead, Effinger was summarily terminated.

120.  Catherine Johnston was a Laundry worker at Care Center Porthaven, LLC also known as Porthaven Care Center in Portland, Oregon in or about October 2014.   Johnston lives with a long-term learning disability, PTSD, anxiety, and depression.  Johnston's learning disability makes it difficult for her to remember things, and therefore she needs her supervisor to write down her tasks for her rather than relay them to her verbally.  Johnston was advised by co-workers not to mention her disability to the facility because she would be terminated due to her disability.  The facility found out about her disability when her Job Coach, Selena Harlo, told her supervisor Jenean, head of Laundry and Housekeeping that Johnston needed accommodations related to her disability.  Shortly, thereafter, Johnston was summarily terminated.  When asked if Johnston could have representation for the termination meeting, her request was denied.

## Count 3:  Failure to Hire

121.  Management Defendants and Facility Defendant Visalia Ventures, LLC discriminated against Charging Party Miller by failing to hire him because of his disability and/or because Defendants perceived him as disabled as described below.

122.  In June 2012, Mitchell Miller applied for a position as a Cook and was hired as a Dietary Aid or Dining Services Aid with Facility Defendant Visalia Ventures, LLC also known as Prestige Assisted Living at Visalia.

123.  During the relevant time period, Miller had a disability of permanent musculoskeletal damage that substantially limited major life activities, including walking, standing, and the functioning of the musculoskeletal system.

124.  After his interview, Miller was given a conditional job offer pending a medical examination.   The medical examination was administered by Valley Industrial & Family Medical Group ("Valley Industrial") on behalf of Defendants.  Based on the examination, Valley Industrial deemed Miller to "meet modified job standards." Defendants refused to hire Miller based on Valley Industrial's recommended restrictions against prolonged walking or ambulating with heavy objects.  Thereafter, Miller provided Defendants a full release without restrictions from his personal physician, but Defendants refused to consider his physician's

release.

125.  Nonetheless, upon receiving the release from Miller's personal physician, Valley Industrial modified its own medical assessment of Miller from "meets modified job standards" to "meets current job standards." Yet, Defendants still refused to hire Miller based on his medical examination results despite Valley Industrial's revised, ultimate conclusion that Miller could work without restriction.  Defendants took such actions against Miller because of his actual disability and/or because they regarded him as disabled.

126.  As described in the above examples, Facility Defendants' managers routinely sought the approval of Management Defendants' Benefits Manager Mitchell Court and Sinikka Loukola of Management Defendants' Human Resources for final decisions and/or guidance pertaining to request for accommodation without properly engaging in the interactive process and medical examinations such as that administered to Miller.

127.  The effect of the practices complained of in paragraphs 89 to 130 above has been to deprive similarly aggrieved individuals of equal employment opportunities and otherwise adversely affects their status as employees and/or applicants because of their actual or perceived disability.  Defendants applied their written policies as a requirement that employees be 100% fit to perform all duties including marginal functions.  Because of Defendants' mandate for a 100% fit workforce, Defendants weeded out disabled employees out by denying leave, preventing employees from returning to work after medical leave, requiring employees to perform marginal functions beyond the essential functions of their jobs to disqualify them from working, summarily denying reasonable accommodations, forcing employees to resign after their requests for leave were denied, and otherwise violating the ADA.

128.  The unlawful employment practices complained of in paragraph 89 to 130 above were intentional and caused employees and applicants to suffer emotional distress because of Defendants' wide-spread and wide-ranging ADA violations.

129.  The unlawful employment practices complained of in paragraphs 89 to 130 above were and are done with malice or with reckless indifference to the federally protected rights of a class of employees of Defendants who were denied accommodations and/or subjected to

1   adverse employment actions because of their actual, record of, or perceived disabilities.

2   **PRAYER FOR RELIEF**

3   Wherefore, the Commission respectfully requests that this Court:

4   A.      Grant a permanent injunction enjoining Defendants, their officers, successors,

5   assigns, and all persons in active concert or participation with each of them, from engaging in

6   any employment practices which discriminate on the basis of disability.

7   B.      Order Defendants to institute and carry out policies, practices, and programs to

8   ensure that they would not engage in unlawful employment practices in violation of § 102(a)

9   and (b), 42 U.S.C. § 12112(a) and (b).

10   C.      Order Defendants to make whole the class of employees of Defendants who were

11   denied accommodations and/or subjected to adverse employment actions because of their

12   actual, record of, or perceived disabilities by providing appropriate back pay with prejudgment

13   interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate

14   the effects of its unlawful employment practices, including but not limited to rightful place

15   reinstatement or front pay.

16   D.      Order Defendants to make the class of employees of Defendants who were

17   denied accommodations and/or subjected to adverse employment actions because of their

18   actual, record of, or perceived disabilities and similarly aggrieved individuals whole by

19   providing compensation for past and future pecuniary losses, including but not limited to out-of-

20   pocket expenses suffered by him which resulted from the unlawful employment practices

21   described above in the amounts to be determined at trial.

22   E.      Order Defendants to make the class of employees of Defendants who were

23   denied accommodations and/or subjected to adverse employment actions because of their

24   actual, record of, or perceived disabilities and similarly aggrieved individuals whole by

25   providing compensation for non-pecuniary losses resulting from the unlawful employment

26   practices described above in amounts to be determined at trial.  The non-pecuniary losses

27   include emotional pain, suffering, inconvenience, mental anguish, humiliation and loss of

28   enjoyment of life, in amounts to be determined at trial.

1      F.      Order Defendants to pay the class of employees of Defendants who were denied

2    accommodations and/or subjected to adverse employment actions because of their actual, record

3    of, or perceived disabilities and similarly aggrieved individuals punitive damages for their

4    malicious and/or reckless conduct in an amount to be determined at trial.

5      G.      Award the Commission its costs of this action.

6      H.      Grant such further relief as the Court deems necessary and proper in the public

7    interest.

8                                      **JURY TRIAL DEMAND**

9          The Commission requests a jury trial on all questions of fact raised by its Complaint.

10

11   Dated: September 28, 2017                     Respectfully Submitted,

12

13                                                 JAMES LEE,
                                                   Acting General Counsel

14                                                 GWENDOLYN YOUNG REAMS,

15                                                 Associate General Counsel

16                                                 U.S. EQUAL EMPLOYMENT
                                                   OPPORTUNITY COMMISSION
17                                                 131 "M" Street, N.E.
                                                   Washington, D.C.  20507
18

19

20                                          By: _____
                                                   ANNA Y. PARK,
21                                                 Regional Attorney

22

23

24

25

26

27

28

                                                -33-